Case number 22-1814 from Nebraska, Jane Doe et al. v. Board of Trustees of the Nebraska State Colleges Mr. Martin Thank you. Good morning. Always a pleasure to appear before the Eighth Circuit. My name is George Martin. I am external counsel to the Nebraska State College System. And in this particular case, we're talking about a member college, Chatham State College. I've asked for two minutes for rebuttal. The transcript in this case, I think, exemplifies every single thing the U.S. Supreme Court hoped to avoid when it created the deliberate indifference standard. Administrators, instead of having deference, are questioned about why they made the decisions that they made. Administrators who have policy reasons for doing what they did are challenged as to whether or not their reasoning and their policies are as good as someone else's reasoning or policies. The standard that deliberate indifference must equate to an official decision not to take action is what protects administrators and allows them to do their jobs in real time, in real life, without facing the sort of second guessing and really ridicule that they faced in this case. I know we're here on post-trial motions, but it's a case that should have never been submitted to the jury. When you submit a case like this to a jury, what you're left to say to that jury is, you're here in a courtroom, you're hearing all these criticisms, but take it from the college, these criticisms aren't legally significant. And it's an impossible place to put Institute of Higher Education. In this case, that was made all the much worse by the fact that there's no instruction on subsequent harassment and certainly not a proper causation instruction either. So now you have a group of administrators that are not only being second guessed about things that they shouldn't be being second guessed about, but they're being second guessed and the jury is being told, and if these criticisms, if these things we're saying they could have done differently would have left this plaintiff with less emotional trauma, if it would have satisfied this plaintiff more emotionally to have these different things occur, then you should award that person damages. Well, let me ask you this. So it may not be actionable, as you're arguing, but this seemed to be a pretty bungled process. I mean, to have a person who had been sexually assaulted twice and really is, you know, I used to teach, I used to be at a university, this seems like a slap on the wrist at best. And so it seems like the whole process was sort of bungled from the beginning, and I think that the award of damages, again, we can have a discussion about this, but the award of damages reflects that the college did not do a good job with this. But the way you worded that, they didn't do a good job, is light years from deliberate indifference. It just is. It just is. And the idea that it might have been bungled, there's case after case after case that says mistakes or negligence are not enough. And as to the slap on the wrist, and I know we don't need to delve into the facts too much here, you know, what they explained was we don't really know what happened. We found a policy violation, and if you believe that any, you know, non-consensual sexual contact is rape or an assault, then that's what happened. But it was really the absence of a specific finding about what had occurred beyond a policy violation that led to the framing of that disciplinary action. Well, am I wrong on this? Because I'm wrong on a lot of stuff. But I look at the Nebraska Administrative Code as it exists today. Let's start with, I don't know, is it BILA? Is that the name of the? BILA. BILA? All right. We think of Ms. BILA. As the Administrative Code existed at the time, I think it was like 94-013, actually. Right. It's fuzzy. You know, the way, if you read what it says today, it plainly says that there's a duty of confidentiality, all right? And so, but that wasn't what was in place at the time. If you go back to the code provision that was at the time, it says that, well, that you have the ability to breach confidentiality in a report if you think that there's a threat of harm, substantial harm, to the complaining person or others, right? And it was quite broad, right? Now, if that's a purely discretionary obligation, then it's hard to get to deliberate indifference on that. But if, in fact, if it's mandatory, if you decide that somebody's at a further risk of harm, and one could rationally conclude that you would be at further risk of harm if you work in a building that the alleged perpetrator has regular access to, that there's two prior incidents that are alleged, then if there's a failure to report that, then that failure to report can give rise, as she is a state employee employed by the university system or the college system, could give rise to some sort of claim of deliberate indifference, at least as a question of fact. Right? Or am I wrong? The facts of this case are much different than what you've referred to, and let me explain why I say that. At the time this report is made, there haven't been two instances. There's been one instance, number one, when she speaks to Bilo the first time in May. Is that what you're talking about? Yeah, what I'm talking about is the first time in May and then the follow-up conversation, right? And I thought that there was some groping beforehand before the rape. Or was that all part of the same incident? It was one incident. She goes to the room. She leaves. She goes back. It's one incident over a period of some short period of time. Yeah. Okay. Yeah. So that's the first thing I would say. Second thing I would say is, you know, Bilo said, by the time I learn of this, he's off campus. You know, he's not even around anymore. So I didn't perceive there was any reason to believe that she was at risk because of him. Third, I don't think any of that matters because she's not an appropriate person under Title IX. Right? She's bound by 3020. She doesn't have the capacity to remedy these things. And so, you know. That's true. If she was. And so essentially, as long as she's under no absolute duty to report this up the chain. Right. Then it's all discretionary. And then you get to the point where you get to the end. It's hard to know because you get to the end and you say, well, they had no knowledge that any of this was really going on until the second incident. And then the question is, is the follow-up to that deliberately indifferent to the second complaint? Correct. Right? Right. There's never been. This case was never presented in the complaint all the way through to the pretrial order as there was a complaint made and didn't respond to. It's always been a single complaint on September 19, 2016. Well, and there's another fact that I found fascinating. We kind of dug into the record on this, but it is in the record, which is that Bilo was not even an employee of the college at the time the first report was made. Correct. I think it was not until later that she became an employee. Right. Which brings up all kinds of interesting issues about the duties of an independent contractor and whether an independent contractor could ever be a responsible person. And it drives home the fact that she's not an appropriate person under Title IX. I wanted to comment for a minute on Shake Shaft. I mean, this is a real problem. And, you know, as we prepared for trial, we looked for cases that say in Title IX you don't get to bring in an expert that says this is what Title IX is. And what we found were a lot of cases where people are showing up in this space and saying, I'm an expert and I can tell the jury, you know, what's required of Title IX. What we understood the court was going to allow is testimony perhaps about an industry standard. And we felt comfortable in that because the only thing that Shake Shaft had ever testified to is I'm here to tell you whether they violated Title IX or not. It didn't seem like she would have anything to testify about. And instead what the court allowed was testimony that said, look, you've got to comply with the guidance to comply with Title IX, which is wrong. And now I'm going to tell you they didn't comply with the guidance. And it's really, really toxic. It's really problematic. It would be no different than in an ADA employment case, bringing someone in and having them say, I'm here to tell you how they bungled this accommodation process. I'm here to tell you they violated the ADA. And so, you know, I've sat a long time as a district judge. It always seemed to me that you let the guys testify and say, here's what Title IX requires in our understanding of what is done in the industry. The schools. Yeah. You know, with the schools. Yeah. You know, blah, blah, blah. Right? And as long as they don't cross the line and they don't say, I think the school violated this particular section, you don't have a problem. Right? You know, generally speaking, that's kind of it. And I think it bleeds in, just like Judge Battalion says, well, we let this happen all the time. Because it bleeds out of, actually, all the malpractice cases where we have, you know, people testifying as the standard of care. And you get kind of used to say, this is the standard of care. This is what you've got to do, A, B, C, and D. You know, as long as they don't come out and say, you did not do A. And therefore, I think you, you know, they don't testify to that ultimate question. We let it go. But when you say the guidance is how you comply with Title IX and they violated the guidance, I think we go beyond that. You're beyond that. Because now, obviously, you're interpreting what Title IX is. Right. Without saying, all institutions believe that the guidance given by the department is instructive. And here's what the guidance is. And I think that's the standard of care, boom. Which you could testify to. And you can still get objections. But you're still not testifying to that ultimate question. Right. Right? Yes. I mean, I would disagree that you can go that far. But ultimately, that's different than what we have here. That's different than where we're at. Right. I mean, I think that in the end, there ought to be, well, you know, just if you look at the way we manage trials generally, somebody gets to lay in evidence of what is the standard of care within this business or institution, right? And we understood an industry standard being, I've worked with hundreds of colleges. Here's what most of those colleges do. Or this is what you would find if you go to the national seminars. But when you're talking about the OCR guidance, and then you say that guidance requires you to make the plaintiff whole, you know, and then the jury says, well, geez, you testified that you have to have a punishment, that discipline has to come before rehabilitation. Can you tell us more about that? It's clear that that had a significant influence on this jury. And it's wrong. It's not consistent with the guidance that we're titled on. If there's no more questions. Oh, I'm sorry. Yeah. About your earlier argument on deliberate indifference. And I just have a question about the presentation of your issues. Are you arguing just straightforwardly that the instructions were wrong? And so that all of your legal arguments are about and factual arguments really are about what the jury should have been instructed on? Or do you have a freestanding argument that even under the instructions as given, this didn't meet deliberate indifference? I wasn't quite sure how you were presenting your appeal. Well, number one, it shouldn't have been submitted to the jury. And number two, the instruction they got on deliberate indifference was wrong because it said reckless indifference rather than deliberate indifference. So if this just to help me understand your position, if the court were to say, no, Judge Battalion got the instructions close enough. Is that sort of the end of that portion of your argument on appeal? And then we would turn to the expert opinion question. Well, no. I guess with regard to the motion for new trial, we've taken on the jury instructions in Shake Shack. But with regard to the motion for a directed verdict, we've taken the position that it shouldn't have been submitted to the jury at all, that it doesn't meet the legal requirements necessary for a submittable case. And I may not be answering your question well, and I apologize. And I'm just wondering if that if your latter question, it doesn't meet the submissible standards for a submissible case. That's sort of the same as your jury instruction argument. In other words, you got the district court, you got the law wrong when you sent it to the jury. You imported that same legal error into the jury instruction such that and I don't mean to be putting I'm not trying to tell you what you're arguing. But I was trying to understand whether that's sort of all the same legal argument. You just bungled the law. And so whether you get at it at the submissible stage or you get it at the jury instructions, that's really what you're talking about. I hadn't conceived of it the way you're thinking of it. I had conceived of it as it shouldn't have been submitted to the jury at all. And if it was going to be submitted to the jury, you got the instruction wrong, I guess, is how I was thinking of it. So I was putting it wasn't submissible. It's not a case. There's no evidence to go to the jury. I was putting that before the instruction. I'm going to cut into your rebuttal and I apologize for this. But I had one other question, too, which is damages. You argue about damages. But my understanding is you did not object on that basis below. So are we in I don't like plain air review in civil cases because there's no textual basis for it. But are we in plain air land? Yeah, I wondered if that would come up. I begin my answer by saying Cummings was decided six months after this trial occurred. And so I view it as a change in the law and one that I don't think could reasonably be anticipated at that time, given that there were hundreds of cases out there suggesting that you could receive emotional distress damages, compensatory damages. So to me, it's not something that had to be preserved on the record in light of the subsequent Cummings decision. But the answer is, yes, you didn't object. The answer is, yes, I did not object. Thank you. Thank you. Ms. Chalupka, when you're ready. You pronounced it right. Coming from you pronounced it right, I'm impressed. Judge Erickson, Judge Strauss, Judge Kelly, thank you for receiving argument in this case. My name is Maren Lynn Chalupka. I'm here from the Nebraska Panhandle respectfully asking this court to affirm the jury verdict in favor of Jane Doe. Jury verdicts are entitled to great deference, and this court does not set jury verdicts aside unless no reasonable jury could have reached the same verdict based on the evidence submitted. The facts and the reasonable inferences are resolved in favor of the plaintiff that has received that verdict. Conflicts are resolved in favor of the person that received that verdict. This is a case in which the school had spoken the correct language about complying with Title IX, but the remedy of unenforced probation and telling a rape victim to enforce her own no-contact order herself and placing the rapist in the same tiny counseling center where she was receiving counseling and telling the rapist to take a test about alcohol when alcohol wasn't involved, that remedy was not calculated to end the harassment. And so the jury found that the school was deliberately indifferent. So is it really, are you getting at the punishment? This is what's confusing about the case. Are you really getting at the punishment that was meted out by the school or the failure to report and failure to take action before the second assault? I didn't hear the last part of your question. Oh, before the second assault, the failure to report it and take appropriate action before the second assault occurred. I'm just trying to figure out what the jury heard and what the theory of the case was. I'm getting at how the school responded after the second assault. Okay, so now does that present a problem? Because that's kind of an in-between claim in the sense that for a harassment claim, you need to have the failure to take appropriate actions to prevent future harassment. I don't know that the failure to properly punish someone and then for that harasser never to do anything again is actually actionable. Well, what I'll do in response to that, Judge Strauss, is cite to this court's language in Schenck v. Carleton College, which came out of the Davis case of the United States Supreme Court, which was saying that deliberate indifference is defined by when it causes students to undergo harassment or make them liable or vulnerable to it. Well, that's different. So I thought about that. And I think that's a situation in which the school sets up something that's risky. So, for example, this doesn't happen today, but maybe it happened 30 years ago. It was in the movie Grease. You set up a kissing booth, right, and it puts female students in a terrible position and a sexual assault occurs or something of that nature. I think that's getting at where there's some affirmative action that the school takes that puts them in that position, not the situation in which no further harassment behavior happens. What we had in this case and what I think the jury responded to was that the sanction or the remedy that was chosen by the school in this case and what the evidence showed was that it made this plaintiff vulnerable to further harassment. And what I can explain in that to be more secure or to be more illustrative is that the evidence showed that Shadron knew, the school knew, that his campus was too small for Jane Doe to avoid her rapist. Jane Doe had told the Title IX coordinator how after the first rape, when she talked to him after the second rape and gave her interview, she told the Title IX coordinator that after the first rape, her rapist had taunted her on campus, had accosted her in the computer lab, that kind of behavior. And after the second rape, the video that the Title IX coordinator viewed showed him stealing her phone, taunting her again. And so the school knew that this rapist didn't just assault her and leave and was gone. The administrators knew that his unrestricted presence would make Jane Doe vulnerable on this small campus to harassment or assault. And all of this happened after the second assault and after the vice president, and everybody in the college knew that additional harassment. That she would be vulnerable to further harassment or further assault. But was there actually, I mean, I know that she may have been vulnerable, but was there actually any further harassment by the student who sexually assaulted her? There was another encounter with Mr. Ige, with the rapist. There was another encounter with him. But the language that we have in shame— What happened at that other encounter? I'm sorry, Judge Erickson? What happened at that encounter? At that encounter, it was the first day back at work for Ms. Doe, the first time that she returned to work after the rape. She had been told that she could go back to her original duty station, that Mr. Ige was going to be moved out of his dorm, which is where her duty station was. That was the safety plan. The administrators then changed the safety plan without telling her. And so when she went back to work, he was still in the dorm, and she encountered him in her workplace. So she just saw him? She saw him, and she had a panic attack, and she left. But he didn't say anything, or there wasn't any direct— I mean, this is a terrible case, so I don't want to minimize it. But at that particular incident, was there any interaction between the two? No. She removed herself before there was any interaction. She removed herself. And she didn't go to work that day. She missed her work that evening, and that was the end of that. So because she removed herself, there wasn't another encounter. So that was what happened. That's how small the campus was. And this happened because the administrators changed the safety plan without informing her that they had done so. So there you go. She was vulnerable to harassment or vulnerable to another assault. And that's the language that comes out of Schenck. That's the language that comes out of Davis, and that's the law that is still law right now, and it was still law when we had our trial in 2021. So the school knew that their remedy of saying, you go back to campus and take the risk and enforce your own no-contact order, risk these panic attacks, risk having to leave work, risk not being able to go to counseling, they knew that remedy was not reasonable. And Jane Doe told them that it wasn't reasonable, that she was vulnerable to further harassment or further assault, just like she had been after the first sexual assault when he taunted her, when he accosted her in the computer lab, which she told them about. Well, let me, you know, I'm going to get at the earlier question I asked, and really always for me the lodestar is the text of the statute, I mean the text of the statute, and I realize that an entire common law has developed, or not a common law, but an entire body of law has developed around it. But in the end, what you're relying on, I think, is the language saying subject to discrimination, that that language is actually, you know, includes harassment, but I think subject to discrimination, it refers back to the college. And so what I'm trying to figure out here is how the college subjected her to harassment, which is the form of discrimination that you allege. And I'm not seeing it, I'm not seeing what actual harassment is attributable to the college's actions. It was subjecting her to the vulnerability to it. Subjecting her to the vulnerability to it. We had extensive testimony about how her reaction to, well, first of all, knowing, again, that this person was still there, and that he had, after the first rape, accosted her, taunted her, continued to encounter her, and shown that he was willing to do so again, and what the response that she had was. Melting down, having panic attacks, being unable to function. And that she had told the school that this is what the reaction was when she encountered him. And the school's reaction was, well, we'll put a no contact order on him, and when you see him, you call the campus security, you stand your ground, you wait for someone to show up and remove him. And that's not a reasonable thing to tell her to do, especially when there was evidence that the no contact orders had a 30% failure rate on this very small campus. That's not reasonable for them to do. The problem with the school's... I'm sorry, Your Honor. The vulnerability, is that going to be subject to an objective review or subjective review? I mean, does the vulnerability of a person change depending on who that person is, right? And if that's the case, are there any limiting principles? I don't... In this case, there didn't need to be, because the evidence was clear enough and strong enough that it showed. Yeah, that just subjectively this should be... It doesn't matter. Rather than taking Doe as Doe, we would take Doe as any victim in a like circumstance, right? Right. And so the focus is going to be on a generic victim as opposed to Ms. Doe. Right. And I'm thinking in my mind, Judge Erickson, as a contrast to the Schenck case. In the Schenck case, as I recall, in the facts, the plaintiff of the Schenck case didn't make a case for vulnerability. I don't think that there was any argument that she was vulnerable in that case. Ms. Doe made a... There was extensive testimony and extensive evidence about her vulnerability and about her panic attacks. In fact, the record of this trial showed that she had a panic attack in the courtroom during the trial. And so the evidence there was weighty in that case. Counsel, the vulnerability does seem to be sort of the sticking point to opposing counsel, says that's not enough. You need another episode of harassment or assault of some sort. And so in looking both at the statute, as Judge Strauss indicates, the statute is bare bones, but it's been developed through the case law. But the jury instructions here, which is the focal point of your opposing counsel's appeal in many ways, say nothing about vulnerability. Was that ever proposed to insert that language from Davis and Schenck into the jury instructions? I don't think it was, Judge Kelly. I don't think it was. And the jury instructions that ended up being given to the jury were neither the defense's nor mine. They were put together by Judge Battalion. And I think there's even a reference in the transcript to him saying, I'm going to split the baby on this one. They ended up being neither the plaintiff's proposed nor the defense proposed instructions. And I suppose the jury, just by the instructions, they didn't have vulnerability as an option, so they thought that whatever it was was harassment. I mean, is that a possible conclusion from the jury's verdict? I believe what they must have, well, I'm reading minds here, but my guess is that they focused on the deprivation in jury instruction 18, talking about the deprivation of the school activities or benefits. Yes, so she was denied the opportunity to get the full benefit of her schooling, which may be sort of an other side of the coin way of saying she was vulnerable to this kind of harassment or discrimination. Correct, Judge Kelly. She said that she wasn't able to go to class, counseling, the student center, the computer lab, the library, all the benefits that she would have otherwise had. She lost her counseling relationship. So again, that's my tea leaf reading with the jury, but that would be how I would interpret it. The problem with the position of the defense and saying we want subsequent harassment and we want to define it that way is that it's a result-oriented analysis, saying we'll determine whether our remedy will end the harassment in hindsight. Did we get lucky and the perpetrator didn't reoffend? But under Davis and under Schenck, that's not really how it's supposed to work. It shouldn't be about whether a third party has impulse control. It should be focusing on the recipient of the funding and the school's decision of how can we get the victim to return to campus in real time now. I don't want to leave this section without addressing Judge Erickson. But I'm trying to think of that, this sort of idea that it depends upon the third party. I'm not sure that's true because as long as there's some positive action taken, it may well be that that positive action taken by the school, while we perceive it as being woefully insufficient, and I do perceive it as being – I said it was probably bungled. It may have had the desired effect. It may well be that the assailant stopped doing it because somebody noticed it and he didn't want worse sanctions placed on him. I don't know. I just think that that argument could get us in a lot of trouble, this sort of Monday morning quarterbacking. But it wasn't – it was not a remedy that was designed to end the harassment. It was a remedy that burdened the victim, saying that you have to endure vulnerability to knowing that you're going to see the perpetrator if you go to counseling, if you go to class, if you go to the gym, if you go to the student center, and you have to enforce your own no-contact order yourself, as opposed to saying to the perpetrator, you go get counseling somewhere else, or maybe you are the one that only gets to go to class and to your dorm room. I was listening to Judge Strass to your questions about the least restrictive alternatives in the last argument and thinking about how the opposite of that might translate here. I wanted, in my last 30 seconds, if I can quickly babble out something about the questions about Dr. Shakespeare. The last thing I would say is that if there was any error, and I don't agree that there was. I think that all the questions that she answered were within the acceptable parameters. But if there was any error, the defense corrected it by putting up its own quasi-expert, Dr. John Hansen, and having him speak to his interpretation of how all of his training and all of the OCR guidance worked. And he gave his own quasi-expert opinions that everything that he did was correct. And so they cured it with their own quasi-expert opinion of Dr. John Hansen. Thank you so much again for hearing our argument in this case. We ask that the jury's verdict would be affirmed. Thank you, Your Honors. Mr. Martin, at about 1.30 you were interrupted by a last question, so I'll go ahead and give you another minute. Thank you very much. Three things. One, I want to push back on bungled again, and here's why. If you look at what the OCR guidance says you do, even in cases of sexual assault and the kind of punishment you mete out, it is word for word what the college did here. And so to a layperson out on the street or in the jury box, they say, well, gosh, if there's a sexual assault, you expel, you're done, it's over. But the OCR's writings on that are much, much, much different. In fact, the OCR guidance even contemplates that if you're a student on a school and the person who sexually assaulted you hasn't been expelled and that's a problem for you, you have the option to transfer. That's in the OCR guidance. So the OCR guidance in no way contemplates expulsion as sort of a go-to. And I think what OCR is trying to do is get schools to invest in the people that engage in these transgressions to some degree. And that's what these folks are taught, and that's what's in the record. So I just want to be very clear that there's a guttural response to sexual assault and what should occur, and then there's all the things these folks are taught by the OCR and by these other groups and materials in the record that is much different than that. And so I push back on bungled. I'm going to read a quote from Schenck. Under governing precedent, a Title IX plaintiff must demonstrate a causal nexus between the college's conduct and the student's experience of sexual harassment. A causal nexus between the college's conduct and the student's experience of sexual harassment. That just does not exist here. The plaintiff admitted as much on the stand. That element of this claim cannot be satisfied. This was never a case about the May report. From the complaint to the pretrial conference on September 19, 2016, it's a one-report case. And I'm out of time, so thank you very much. I appreciate it. Thank you very much. I want to thank the parties for their argument and briefing. It's been helpful to the court. The case is taken under advisement. Are there any other matters to come before the court this morning? No, Your Honor.